# In the United States Court of Federal Claims

<table>
<tr><td>

**STACY L. DEFENZA** *as administrator of* **ESTATE OF LINDA L. CHERVENOK,**

*Petitioner,*

**v.**

**SECRETARY OF HEALTH AND HUMAN SERVICES,**

*Respondent.*

</td><td>

No. 18-1601
(Filed Under Seal: May 29, 2026)
(Reissued Publicly: June 16, 2026)

</td></tr>
</table>

*Jeffrey S. Pop*, *Kristina E. Grigorian*, Jeffrey S. Pop & Associates, Beverly Hills, California, for Petitioner.

*Nina Y. Ren*, Trial Attorney, *Julia M. Collison*, Assistant Director, *Heather L. Pearlman*, Deputy Director, *Jonathan D. Guynn*, Acting Director, Torts Branch, *Brett A. Shumate*, Assistant Attorney General, Civil Division, United States Department of Justice, Washington, DC, for Respondent.

## OPINION AND ORDER[1]

**HADJI,** *Judge***.**

Petitioner seeks review of a decision denying her petition for compensation under the National Vaccine Injury Compensation Program. For the reasons stated below, Petitioner's Motion for Review (ECF 109) is **DENIED**, and the Special Master's Decision (ECF 107) is **SUSTAINED**.

## BACKGROUND

### I.    Petitioner's Medical History

The underlying facts set forth in Petitioner's medical records are few and undisputed. Accordingly, the Court adopts such facts as set forth in the Special Master's Decision and briefly recounts them here.

---

[1] This Opinion was issued under seal on May 29, 2026. The parties were directed to propose redactions by June 12, 2026. No proposed redactions were received. The Court hereby publicly releases the Opinion and Order in full.

On October 21, 2015, Petitioner Linda L. Chervenok received a flu vaccination.[2] ECF 107 at 5. The next day, she began experiencing shortness of breath, numbness, tingling, and flaccid paralysis in her extremities. *Id.* Petitioner was ultimately diagnosed with Guillain-Barre Syndrome (GBS). *Id.*

Petitioner's October 2015 flu vaccination was not her first; she had previously received flu vaccinations, including some that contained H1N1 components. *Id.* at 6. Petitioner also suffered from chronic lower back pain. *Id.* On October 8, 2015, approximately two weeks prior to the vaccination at issue, Petitioner underwent a radiofrequency ablation procedure to treat this condition. *Id.*

## II.    The Petition and Procedural History

On October 16, 2018, Petitioner filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*,[3] alleging that her October 2015 flu vaccine caused her to develop GBS. ECF 1 at 1. In support of her claim, Petitioner submitted medical records, affidavits, and an opinion letter from her treating neurosurgeon, Allison Rathmann, D.O. *See* ECF 9, 13, 37. Respondent submitted his Rule 4(c) Report, which primarily argued that the petition should be dismissed due to the 24-hour post-vaccination period of onset. *See generally* ECF 29. In response, Petitioner submitted an expert report by neuroimmunologist Lawrence Steinman, M.D., along with supporting medical literature. *See generally* ECF 34-1, 37. Dr. Steinman opined that the flu vaccine can cause GBS within 24 hours via molecular mimicry and that a recall antibody response due to prior flu vaccinations can manifest within 24 hours. ECF 34-1 at 1.

Disputing causation, Respondent filed a responsive expert report and supporting medical literature by immunologist J. Lindsay Whitton, M.D., Ph.D. *See generally* ECF 43-1. Dr. Whitton characterized Dr. Steinman's theories of molecular mimicry as "deeply flawed" and challenged his opinion that molecular mimicry can lead to disease within 24 hours, even in the context of a recall response. *Id.* at 26.

Following review of Drs. Steinman and Whitton's expert reports, the Special Master issued a Rule 5 Order expressing skepticism that Petitioner could meet her burden of proof under the three-prong test articulated in *Althen v. Secretary of Health & Human Services*, which requires petitioners, in relevant part, to establish a "proximate temporal relationship" between the vaccination and the injury alleged. 418 F.3d 1274, 1278 (Fed. Cir. 2005); *see* ECF 44 at 1. Recognizing that much of the reasoning in Dr. Steinman's expert report regarding onset had been previously rejected by another special master, the Special Master

---

[2] Petitioner Linda L. Chervenok passed away in April 2025. ECF 103-1. Her daughter, Stacy L. DeFenza, has been substituted for Petitioner as estate administrator. *See* ECF 109 at 6; *see also* Docket, Case No. 18-1601.

[3] The National Vaccine Injury Compensation Program was established by the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (the Vaccine Act).

recommended that Petitioner strongly consider the voluntary dismissal of her claim. ECF 44 at 1-2 (citing *Rowan v. Sec'y of Health & Hum. Servs.*, No. 17-760, 2020 WL 2954954 (Fed. Cl. Spec. Mstr. Apr. 28, 2020)). Rather than do so, Petitioner submitted a supplemental expert report from Dr. Steinman, focused on the timing of onset. *See generally* ECF 46-1. Respondent countered with a responsive supplemental report by Dr. Whitton. *See generally* ECF 51-1. Petitioner and Respondent each filed an additional supplemental expert report, through which they continued to offer divergent opinions on the significance of the short interval between Petitioner's vaccination and the onset of GBS. *See generally* ECF 53-2; 55-1. Petitioner also filed a second opinion letter by her treating neurosurgeon. *See generally* ECF 53-1. The letter noted that "no other cause for [Petitioner's] GBS was identified following a robust work up," and described two pieces of medical literature that discussed the timing of onset of GBS following a flu vaccine, both of which Dr. Rathmann claimed supported a 1-2 day interval between flu vaccination and GBS. *Id.* at 1. Dr. Rathmann also reasserted her belief that the flu vaccination was more likely than not the cause of Petitioner's GBS, though she "defer[red] to a neurologist or immunologist on how biologically this can occur." *Id.*

In the lead up to the entitlement hearing, the parties both filed additional evidence, including updated medical records and medical literature. *See* ECF 60, 61, 64, 66, 67, 68, 70, 71, 72. As relevant here, Petitioner ultimately introduced several epidemiological studies, which she contended provide support for the proposition that the flu vaccine can cause GBS within one day. These studies include the Schonberger,[4] Salmon,[5] Polakowski,[6] and Park[7] studies. *See* ECF 36-5 (Schonberger); ECF 47-2 (Salmon); ECF 68-4 (Polakowski); ECF 47-1 (Park). All four studies observed cases of GBS occurring within two days of vaccination. *See* ECF 107 at 19, 22-23. As described by the Special Master, the Schonberger study is a surveillance study conducted following a 1976 mass vaccination campaign. *Id.* at 19. It is generally accepted as providing support for the proposition that the flu vaccine can cause GBS and indicates that incidence of GBS was elevated relative to the first full week post-vaccination. *Id.* at 19-20. The Salmon and Polakowski studies were likewise conducted following a mass vaccination campaign, this time in 2009. *Id.* at 21. The Salmon study meta-analyzed an exposure window of 1-42 days and confirmed that first week results were statistically significant. *Id.* at 22. The Polakowski study, which examined chart-confirmed cases of GBS, similarly considered a risk period of 1-42 days. *Id.* It found an elevated risk of GBS for the six-week period following vaccination. *Id.* And

---

[4] Lawrence B. Schonberger et al., *Guillain-Barre Syndrome Following Vaccination in the National Influenza Immunization Program, United States, 1976-1977*, 110 AM. J. EPIDEMIOLOGY 105 (1979).

[5] Daniel A. Salmon et al., *Association Between Guillain-Barre Syndrome and Influenza A (H1N1) 2009 Monovalent Inactivated Vaccines in the USA: A Meta-Analysis*, 381 LANCER 1461 (2013).

[6] Laura L. Polakowski et al., *Chart-Confirmed Guillain-Barre Syndrome After 2009 H1N1 Influenza Vaccination Among the Medicare Population, 2009-2010*, 178 AM. J. EPIDEMIOLOGY 962 (2013).

[7] Yong-Shik Park et al., *Clinical Features of Post-Vaccination Guillain-Barre Syndrome (GBS) in Korea*, 32 J. KOREAN MED. SCI. 1154 (2017).

finally, the Park study examined the demographic characteristics of GBS patients who sought compensation from South Korea's version of the Vaccine Program. *Id.* at 23. In that study, half of all examined cases developed symptoms within two days of vaccination. *Id.*

On March 4-5, 2024, the Special Master held an entitlement hearing, where both experts testified. *See* ECF 92, 93. Following the hearing, both parties filed post-trial supplemental expert reports and post-hearing briefs. *See generally* ECF 95, 97-1, 98-1, 99, 100, 102.

On January 7, 2026, the Special Master issued his Decision. ECF 107. The Special Master found that "there is no dispute that the onset of [Petitioner]'s GBS occurred about 24 hours post-vaccination," and focused on what he characterized as the "core dispute" in this case: "whether that period of onset is appropriate for a causal inference based on Dr. Steinman's theory of causation, which is based on molecular mimicry." *Id.* at 9.

The Special Master answered that question in the negative. Deeming the testimony of Respondent's expert, Dr. Whitton, more persuasive than that of Petitioner's expert, Dr. Steinman, the Special Master found that "Dr. Steinman has not come forward with a preponderantly supported explanation of how [P]etitioner's flu vaccine could have produced an autoantibody response leading to a loss of immune self-tolerance and subsequent development of GBS within 24 hours of vaccination." *Id.* at 18. Regarding the studies cited by Dr. Steinman, the Special Master determined that they "are not entirely lacking teachings potentially supportive of [P]etitioner's view," but "they do not ultimately add significantly to [P]etitioner's claim," given their respective weaknesses and limitations. *Id.* at 18-19. In particular, he found that the Schonberger, Salmon, and Polakowski studies did not include any calculations to support excess risk of GBS *on Day 1*, even though the studies technically expressed the period of elevated risk in a manner that did not exclude Day 1. *See id.* at 19-23. Crediting Dr. Whitton's testimony that approximately five cases of GBS are expected each day purely as a result of chance, the Special Master further found that "one or two cases of GBS occurring on any given day could be the result of chance, greatly tempering the potential significance" of the Salmon and Polakowski studies, which each observed less than five cases on Day 1. *Id.* at 23. With respect to the Park study, the Special Master determined it was "difficult to draw any conclusions from this study" as it observed "a highly selective group" of people seeking compensation for perceived vaccine injury under South Korea's vaccine injury compensation program and "we do not have information on what criteria the compensating authority uses to adjudge eligibility." *Id.* at 23. More broadly, the Special Master found that "epidemiologic data is limited to demonstrating correlation, rather than causation," and weighed Petitioner's epidemiological studies accordingly. *Id.* at 20. Ultimately, the Special Master concluded that "the onset of [Petitioner]'s GBS occurred too soon after vaccination to be causally related." *Id.* at 26 (emphasis omitted).

On February 5, 2026, Petitioner timely filed a Motion for Review. ECF 109. Respondent filed his Memorandum in Response the following month. ECF 112.

## STANDARD OF REVIEW

Under the Vaccine Act, this Court has jurisdiction to review a special master's entitlement decision. 42 U.S.C. § 300aa-12(e)(2). In reviewing a special master's decision, this Court may:

> (A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision, (B) set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or (C) remand the petition to the special master for further action in accordance with the court's direction.

42 U.S.C. § 300aa-12(e)(2)(A)-(C). The standards set forth in 42 U.S.C. § 300aa-12(e)(2)(B) "vary in application as well as degree of deference" as "[e]ach standard applies to a different aspect of the judgment." *Munn v. Sec'y of Health & Hum. Servs.*, 970 F.2d 863, 870 n.10 (Fed. Cir. 1992). Findings of fact receive deferential review under the "arbitrary and capricious" standard; legal conclusions are reviewed de novo under the "not in accordance with law" standard; and discretionary rulings are reviewed for "abuse of discretion." *Turner v. Sec'y of Health & Hum. Servs.*, 268 F.3d 1334, 1337 (Fed. Cir. 2001).

With respect to the arbitrary and capricious standard, "no uniform definition … has emerged," but it is "a highly deferential standard of review" such that "[i]f the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines v. Sec'y of Health & Hum. Servs.*, 940 F.2d 1518, 1527-28 (Fed. Cir. 1991); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (A decision is arbitrary and capricious only if it is "so implausible that it could not be ascribed to a difference in view…."). Accordingly, if a special master's finding of fact is "based on evidence in the record that [is] not wholly implausible," this Court is "compelled to uphold that finding as not being arbitrary or capricious." *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1363 (Fed. Cir. 2000).

The "not in accordance with law" standard, on the other hand, is applied without deference to legal determinations, such as "[w]hether the special master applied the appropriate standard of causation . . . ." *Deribeaux v. Sec'y of Health & Hum. Servs.*, 717 F.3d 1363, 1366 (Fed. Cir. 2013). Lastly, the abuse of discretion standard applies to the special master's discretionary rulings, such as evidentiary determinations regarding the qualification of experts and the admissibility of their testimony. *Piscopo v. Sec'y of Health & Hum. Servs.*, 66 Fed. Cl. 49, 53 (2005). Determinations subject to review for abuse of discretion must be sustained unless "manifestly erroneous." *Id.*; *see also Milmark Servs., Inc. v. United States*, 731 F.2d 855, 860 (Fed. Cir. 1984).

## DISCUSSION

Under the Vaccine Act, petitioners bear the burden of proving, by a preponderance of the evidence, that a vaccine caused an injury or death. 42 U.S.C. § 300aa-13(a)(1); 42 U.S.C. § 300aa-11(c)(1)(C); *Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). The Federal Circuit has "interpreted the 'preponderance of the evidence' standard referred to in the Vaccine Act as one of proof by a simple preponderance, of 'more probable than not' causation." *Althen*, 418 F.3d at 1279. In considering the evidence, special masters are required to consider "the record as a whole." 42 U.S.C. §300aa-13(a)(1). Because "the purpose of the Vaccine Act's preponderance standard is to allow the finding of causation in a field bereft of complete and direct proof of how vaccines affect the human body," *Althen*, 418 F.3d at 1280, proof of medical certainty is not required, *Bunting v. Sec'y of Health & Hum. Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991).

There are two methods by which a petitioner may establish causation and thus eligibility for compensation. *Munn*, 970 F.2d at 865. Through the first method, a petitioner may demonstrate causation through a statutorily prescribed presumption by showing that the alleged injury meets the criteria listed on the Vaccine Injury Table, as set forth in 42 U.S.C. § 300aa-14 and 42 C.F.R. § 100.3. *Id.* The Table identifies the covered vaccines, the corresponding injuries, and the time period after vaccination in which the particular injuries must occur. 42 C.F.R. § 100.3. "[I]f a petitioner can establish that [he] received a listed vaccine and experienced such symptoms or injuries within the specified timeframes, [he] has met [his] prima facie burden to prove that the vaccine caused [his] injuries." *de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1351 (Fed. Cir. 2008). Alternatively, petitioners who have suffered an "off-Table injury," meaning their injury does not meet the criteria in the Table, must use the second method to prove causation. This method requires a petitioner to prove "causation-in-fact" by a preponderance of the evidence. *See* 42 U.S.C. § 300aa-11(c)(1)(C)(ii)(II), 42 U.S.C. § 300aa-13(a)(1); *see also Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1341-42 (Fed. Cir. 2010). "Once causation is established, the petitioner is entitled to compensation unless the Government can show by a preponderance of the evidence that the injury is due to factors unrelated to the vaccine, i.e., an alternative cause." *Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1249 (Fed. Cir. 2011).

In the present case, Petitioner alleged that a flu vaccination caused her to suffer GBS. ECF 1 at 1. Although the Vaccine Injury Table lists GBS as a presumptive vaccine injury following the flu vaccine, onset of symptoms must occur "not less than 3 days and not more than 42 days" following vaccination for it to be considered a Table injury. *See* 42 C.F.R. § 100.3(a). Because Petitioner's onset of symptoms did not begin within the timeframe listed on the Table, Petitioner concedes that she is not entitled to a presumption of causation and that she must thus establish causation-in-fact. ECF 109 at 9.

Under the three-prong test articulated by the Federal Circuit in *Althen*, proving causation-in-fact requires a showing of: (1) a medical theory causally connecting the

6

vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a proximate temporal relationship between vaccination and injury. 418 F.3d at 1278. Although a petitioner need not show that her vaccination was the sole cause of her injury, she must demonstrate that "the vaccine was not only a but-for cause of the injury but also a substantial factor in bringing about the injury." *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352 (Fed. Cir. 1999). "[C]lose calls regarding causation are resolved in favor of injured claimants." *Althen*, 418 F.3d at 1280.

In the instant case, the Special Master found that Petitioner did not meet her burden in establishing causation-in-fact. *See* ECF 107 at 26. Petitioner contends the Special Master erred in four main ways. Specifically, she claims that he: (1) conflated requirements for *Althen* prong 1 in his assessment of *Althen* prong 3; (2) failed to consider the treating neurosurgeon's opinion as evidence in his *Althen* prong 3 analysis; (3) failed to consider Petitioner's elimination of alternative causes in assessing whether she satisfied her burden; and (4) used an elevated standard of proof when assessing epidemiological evidence. *See* ECF 109 at 6-7. The Court addresses each contention in turn.

## I.    Alleged Conflation of *Althen* Prongs 1 and 3

Petitioner contends that the Special Master elevated her burden of proof by conducting an in-depth analysis of Petitioner's medical theory of causation under his prong 3 analysis, thus conflating the requirements for *Althen* prongs 1 and 3. *Id.* at 22-24. She maintains that the Special Master "erroneously created his own 2-part test" and effectively required her "to demonstrate a precise biological mechanism of how GBS can occur in 1 day post vaccination." *Id.* at 22, 24. Specifically, Petitioner takes issue with the following statement by the Special Master:

> Discussion of [prong 3] can be broken down into two distinct topics: First, whether Dr. Steinman has provided an immunologic explanation as to how an injury due to molecular mimicry can occur within 24 hours; and second, whether available epidemiology bolsters Dr. Steinman's view or otherwise persuasively establishes an increased risk of post-vaccination GBS inclusive of the first day post-vaccination.

ECF 107 at 9; *see* ECF 109 at 22 (citing same).

The Court discerns no error in the Special Master's analysis. First, the Court does not read the Special Master's decision to create an improper two-part test or require Petitioner to demonstrate the precise biological mechanism by which a flu vaccine can cause GBS in one day, as alleged by Petitioner. ECF 109 at 22. By indicating that discussion of prong 3 would proceed in two parts, the Special Master merely signposted the discussion and previewed the nature of the prong 3 evidence before him. At no point did the Special Master state that, to succeed on prong 3, Petitioner was required to both: (1) provide an immunologic explanation as to how an injury due to molecular mimicry can

7

occur within 24 hours; and (2) provide epidemiological proof. Indeed, the Special Master's language suggests the opposite. By acknowledging that epidemiological evidence might either "bolster[] Dr. Steinman's view *or otherwise* persuasively establish[] an increased risk" on Day 1, the Special Master indicated that there was no requirement for Dr. Steinman to provide an immunologic explanation and that epidemiological evidence might be used to support prong 3 in lieu of Dr. Steinman's expert opinion. *See* ECF 107 at 9 (emphasis added). At no point did the Special Master rule out the use of other evidence or fault Petitioner for failing to provide proof of specific biological mechanisms.

Second, the Special Master properly recognized that, to satisfy prong 3, "[a] petitioner must offer 'preponderant proof that the onset of symptoms occurred within a timeframe which, *given the medical understanding of the disorder's etiology*, it is medically acceptable to infer causation-in-fact.'" *Id.* at 8 (quoting *de Bazan*, 539 F.3d at 1352 (emphasis added)). "As *de Bazan* indicates, the 'etiology' of the disorder determines the appropriate temporal relationship." *Veryzer v. Sec'y of Health & Hum. Servs.*, 100 Fed. Cl. 344, 356 (2011), *aff'd per curiam*, 475 App'x 765 (Fed. Cir. 2012). Accordingly, the Special Master correctly noted that "[t]he explanation for what is a medically acceptable timeframe must coincide with the theory of how the relevant vaccine can cause an injury (*Althen* prong one's requirement)." ECF 107 at 8 (citing *de Bazan*, 539 F.3d at 1352). The Special Master then went on to evaluate whether Petitioner's one-day onset of symptoms was compatible with Dr. Steinman's theory of molecular mimicry. *See id.* at 9-18.

In conducting this portion of the prong 3 analysis, the Special Master thoroughly evaluated whether Dr. Steinman persuasively explained how an injury due to molecular mimicry can occur within 24 hours. *See id.* He weighed Dr. Steinman's assessment of the appropriate timing against Dr. Whitton's competing views and concluded that "Dr. Steinman is not persuasive in contending … that the immune response underlying his theory can develop as quickly as he opines." *Id.* at 10. Specifically, he found that "although Dr. Steinman has demonstrated that a secondary or recall response does develop more quickly than a primary immune response, the concept of a recall response does not explain how molecular mimicry can occur within 24 hours." ECF 107 at 12. After considering concurrent immune processes proposed by Dr. Steinman, the Special Master further found that "Dr. Steinman has not come forward with a preponderantly supported explanation of how petitioner's flu vaccine could have produced an autoantibody response leading to a loss of immune self-tolerance and subsequent development of GBS within 24 hours of vaccination." *Id.* at 18. Ultimately, "[a]fter weighing the competing expert opinions," the Special Master found that "[R]espondent is persuasive in contending that it is biologically implausible for GBS to develop in such a short period of time." ECF 107 at 26. Thus, the Special Master properly evaluated whether the temporal association Petitioner proposed under the third *Althen* prong "relate[d] to the pathology of the specific medical theory alleged to have caused the injury." *Veryzer*, 100 Fed. Cl. at 356. He did not commit an error of law.

8

## II.    The Treating Neurosurgeon's Medical Opinion

Although Petitioner concedes that the Special Master considered the treating physician's opinion when discussing *Althen* prong 2, she argues that the Special Master committed legal error by failing to also consider such evidence as part of his *Althen* prong 3 analysis. ECF 109 at 19-22. This argument fails.

To be sure, in *Capizzano v. Secretary of Health & Human Services*, the Federal Circuit held that a special master committed legal error by failing to consider the opinions of treating physicians. 440 F.3d 1317, 1326 (Fed. Cir. 2006). Specifically, having found that the first and third prongs of the *Althen* test were satisfied, the Federal Circuit held that, "[a]s far as the second prong is concerned, in our view, the chief special master erred in not considering the opinions of the treating physicians who concluded that the vaccine was the cause of [petitioner]'s injury." *Id.* The Federal Circuit further explained:

> The fact that these physicians' diagnoses may have relied in part on the temporal proximity of Ms. Capizzano's injuries to the administration of the vaccine is not disqualifying. We see no reason why evidence used to satisfy one of the *Althen III* prongs cannot overlap to satisfy another prong. In other words, if close temporal proximity, combined with the finding that hepatitis B vaccine can cause RA, demonstrates that it is logical to conclude that the vaccine was the cause of the RA (the effect), then medical opinions to this effect are quite probative. Moreover, *Althen III* explained that medical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.

*Id.* (internal citations and quotation marks omitted) (alteration in original).

Although *Capizzano* discusses the probative value of treating physicians' opinions specifically in the context of an *Althen* prong 2 analysis, several judges on this Court have extended *Capizzano*'s logic regarding the heightened relevance of such evidence to *Althen* prong 3. *See, e.g.*, *Campbell v. Sec'y of Health & Hum. Servs.*, 90 Fed. Cl. 369, 386-87 (2009) (Lettow, J.) (noting that statements made by treating physicians should be afforded more than "some consideration" in addressing *Althen* prong 3); *Contreras v. Sec'y of Health & Hum. Servs.*, 107 Fed. Cl. 280, 299 (2012) (Bush, J.) (requiring that treating physician opinions be given "significant weight" and observing that "it is difficult to conceive of a treating physician who would conclude that a vaccine caused the petitioner's illness without also concluding that the onset of the illness was within a medically-acceptable time frame"); *Mosley v. Sec'y of Health & Hum. Servs.*, 119 Fed. Cl. 734, 742-44 (2015) (Kaplan, J.) (finding that "the special master's failure to even discuss [treating physicians'] opinions in her analysis of prong three constituted legal error").

The undersigned need not decide whether to follow *Campbell*, *Contreras*, and *Mosley* in the present case because: (1) this case is distinguishable; and (2) any error in this regard was harmless. First, unlike in the aforementioned cases, the treating physician's causal opinion included a caveat that calls into question whether she actually offered an opinion relevant to *Althen* prong 3. Specifically, Dr. Rathmann wrote, "I believe that my letter was correct and that the flu vaccination is more likely than not the cause of Ms. Chevenok's [sic] GBS; however, I would defer to a neurologist or immunologist on how biologically this can occur." ECF 53-1.

As discussed, prong 3 "requires preponderant proof that the onset of symptoms occurred within a timeframe for which, *given the medical understanding of the disorder's etiology*, it is medically acceptable to infer causation-in-fact." *de Bazan*, 539 F.3d at 1352 (emphasis added). Because Dr. Rathmann defers to others on "how biologically this can occur," the Court fails to see how she offered any real opinion as to whether Petitioner's GBS began in a "medically acceptable" timeframe under the medical theory alleged to have caused Petitioner's injury. *See Veryzer*, 100 Fed. Cl. at 356 (noting that "the temporal association must relate to the pathology of the specific medical theory alleged to have caused the injury"). The Court cannot fault the Special Master for failing to afford significant weight to the treating physician's medical opinion in his prong 3 analysis when that opinion does not appear to speak to the relevant prong 3 question—whether the onset of Petitioner's GBS began in a timeframe consistent with the medical understanding of her GBS's etiology. *de Bazan,* 539 F.3d at 1352; *see also Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1348 (2010) (finding no error in special master's failure to assign significant probative weight where "none of the treating physicians concluded" that the vaccine caused a petitioner's injury).

Second, even if the Special Master had a duty to explicitly consider Dr. Rathmann's medical opinion in his evaluation of *Althen* prong 3, any failure to do so was harmless error. *See Hines*, 940 F.2d 1526 (finding special master's consideration of potentially improper evidence was harmless error where "the special master's decision was based on a number of factors" and petitioner had not shown that reliance on the error "was likely critical to the result"). This Court has previously found harmless error in some circumstances where a special master may have impermissibly heightened a petitioner's burden of proof. *See, e.g.*, *Caves v. Sec'y of Health & Hum. Servs.*, 100 Fed. Cl. 119, 145 (2011) (concluding that, to the extent the special master heightened petitioner's burden of proof on *Althen* prong 1, any resulting errors were harmless as petitioner failed to meet her burden of proof on prong 2); *Tebcherani ex rel. Tebcherani v. Sec'y of Health & Hum. Servs.*, 55 Fed. Cl. 460, 476 (2003) (holding that the Court was "constrained to find … errors to be harmless in this case, because neither the Special Master's inappropriate reference of an alleged viral illness nor the improper assignment of the burden of proof impacted the ultimate decision").

Such is the case here. Petitioner concedes that the Special Master explicitly addressed Dr. Rathmann's medical opinion in his analysis of *Althen* prong 2, demonstrating

10

that he considered it as part of his overall causation-in-fact analysis. ECF 107 at 7-8. Further, as noted above, Dr. Rathmann's opinion was limited in that she expressly deferred to others on etiology, which minimized the value of her opinion to the extent it supported an appropriate temporal relationship *under the medical theory alleged to have caused Petitioner's injury*. And finally, to support her opinion that "the onset of GBS may occur within 2 days post vaccination," Dr. Rathmann relied on two medical studies that the Special Master discussed at length in his analysis of prong 3. *See* ECF 53-1 at 1 (citing the Salmon and Parks studies). In his description of Dr. Rathmann's medical opinions, the Special Master noted that Dr. Rathmann cited the Salmon and Park epidemiological studies and explained that these studies were discussed in greater detail by the experts. ECF 107 at 6. He then went on to discuss those experts' views. *Id.* at 21-23. As such, nothing in Dr. Rathmann's letters provided any additional reasoning for the Special Master to address. Because Petitioner has not shown that the Special Master's failure to explicitly consider Dr. Rathmann's testimony under prong 3 "was likely critical to the result," *Hines,* 940 F.2d at 1526, or "impacted the ultimate decision," *Tebcherani*, 55 Fed. Cl. at 476, the Court deems any such potential error harmless. Therefore, Petitioner's argument fails.

### III.    Petitioner's Elimination of Alternative Causes

Next, Petitioner alleges the Special Master's assessment of Petitioner's prima facie case failed to consider evidence that Petitioner eliminated alternative infectious causes. ECF 109 at 24-25. This challenge lacks merit.

Though a petitioner is not required to eliminate alternative causes to establish a prima facie case, she "is certainly permitted to use evidence eliminating other potential causes to help carry the burden on causation and may find it necessary to do so when the other evidence on causation is insufficient to make out a prima facie case." *Walther v. Sec'y of Health & Hum. Servs.*, 485 F.3d 1146, 1151 (Fed. Cir. 2007). "In such instances, clearly the special master must evaluate what evidence a claimant presents as part of determining whether the claimant makes a prima facie case." *Id.* That said, "[a]lthough probative, neither a mere showing of a proximate temporal relationship between vaccination and injury, nor a simplistic elimination of other potential causes of the injury suffices, without more, to meet the burden of showing actual causation." *Althen*, 418 F.3d at 1278.

Here, the Special Master expressly acknowledged that "[n]o other cause of [Petitioner]'s GBS has been asserted." ECF 107 at 5. He also noted that "the elimination of alternative causes" played a role in Dr. Rathmann's causal opinion. *Id.* at 7-8. The Special Master then concluded that, under *Althen*, "these considerations standing alone do not carry petitioner's burden of proof." *Id.* at 8. The Special Master's language makes clear that he *did* consider evidence that Petitioner ruled out possible alternative causes; he just did not give it the controlling weight Petitioner wishes he did. *See* ECF 109 at 24 (arguing the Special Master "did not consider the *weight* of absence of alternative causes") (emphasis added). In this regard, Petitioner appears to invite this Court to second guess the

11

Special Master's evaluation of the evidence, which this Court cannot do. *See Porter*, 663 F.3d at 1249.

## IV.    Alleged Elevation of Petitioner's Burden of Proof

Petitioner argues that, when assessing the epidemiological evidence, the Special Master utilized an elevated standard of proof, effectively requiring her to prove her case with scientific certainty rather than preponderant evidence. ECF 109 at 10-19. Under this umbrella, she alleges four specific errors on the part of the Special Master. For the reasons that follow, the Court concludes that the Special Master's disagreement with Petitioner's interpretation of epidemiology does not mean he elevated her burden to scientific certainty.

### A.  Epidemiological Evidence Requirement

First, Petitioner maintains that the Special Master applied a higher evidentiary standard than *Althen* permits, requiring her to provide epidemiological evidence explicitly demonstrating statistically significant results for Day 1 in particular. *See* ECF 109 at 15, 16, 19. She argues that her epidemiological studies presented statistically significant findings for a risk period of 1-42 days, and the Special Master's failure to credit those studies impermissibly elevated her burden of proof. *See* ECF 109 at 10-19.

It is well settled that a petitioner need not present evidence of epidemiologic studies to prove their prima facie case. *Capizzano*, 440 F.3d at 1325. That does not mean, however, that special masters may not assess the reliability or probative value of any evidence a petitioner chooses to present. *See Moberly ex rel. Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d at 1325 ("But to say that proof in the form of epidemiological studies or well-established medical experience is not mandatory does not mean that the special masters in Vaccine Act cases are precluded from inquiring into the reliability of testimony…."); *see also Knudsen by Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994) (holding proof of actual causation "must be supported by a sound and reliable medical or scientific explanation"). Indeed, special masters are entitled to "demand[] some degree of acceptable scientific support." *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 962 (Fed. Cir. 1993). Accordingly, "[a] special master may … properly consider the weakness of medical literature support when evaluating the overall reliability of scientific evidence." *Gamboa-Avila v. Sec'y of Health & Hum. Servs.*, 166 F. 4th 1318, 1322 (Fed. Cir. 2026) (citing *Moberly*, 592 F.3d at 1324).

That is exactly what the Special Master did here. He started by expressly articulating and applying the preponderant evidence standard to the third *Althen* prong. *See* ECF 107 at 8, 18 (explaining a petitioner must offer preponderant proof of medically-acceptable onset and that Dr. Steinman had not come forward with a preponderantly supported explanation). Then, he explicitly wrote that he was *not* requiring epidemiological evidence. *Id.* at 18 ("Of course, the Federal Circuit has previously stressed that a petitioner is not obligated to prove a case with epidemiology."). He went on to assess the reliability and persuasiveness of both Dr. Steinman's theories and the epidemiological evidence proffered by Petitioner.

To be sure, the Special Master relied on the fact that none of the evidence submitted by Petitioner established that Day 1, in particular, included any excess risk of GBS. *See, e.g.*, *id.* at 22. However, he also engaged in a robust analysis to determine whether the evidence Petitioner presented had "some indicia of reliability." *Moberly*, 592 F.3d at 1324. With respect to Dr. Steinman's theories, he weighed them against Dr. Whitton's competing opinions and noted specific deficiencies that rendered Dr. Steinman's view unpersuasive in his view. For example, the Special Master found that "although Dr. Steinman has demonstrated that a secondary or recall response does develop more quickly than a primary immune response, the concept of a recall response does not explain how molecular mimicry can occur within 24 hours." ECF 107 at 12. He likewise found that "[n]one of the evidence or concepts presented by Dr. Steinman overcome the fundamental understanding that even a recall response takes time to develop meaningful levels of antibodies." *Id.*

With respect to Petitioner's epidemiological evidence purporting to show an increased risk of GBS within 1-42 days of vaccination, the Special Master carefully considered weaknesses in the studies. For example, he credited Dr. Whitton's testimony that the Polakowski study had significant limitations, namely that: (1) the authors noted they were unable to fully account for preceding infections;[8] and (2) the study only resulted in statistically significant findings when the broadest diagnostic criteria were used. ECF 107 at 22. He also agreed with Dr. Whitton that it is difficult to draw any conclusions from the Park study, which examined the demographic characteristics of GBS patients who submitted a claim for compensation under South Korea's equivalent of the Vaccine Program. *Id.* at 23. Specifically, the Special Master identified the following concerns: (1) the study's representation of "a highly selective group;" (2) the lack of information concerning "what criteria the compensating authority uses to adjudge eligibility;" and (3) the fact that the overall distribution curve observed in Park differed from those observed in Schonberger, Salmon, and Polakowski, "strongly suggesting that the parameters of the compensating scheme may have contributed to the distribution." *Id.* at 23. Regarding Schonberger, the Special Master noted that the study authors included an "explicit indication" that, "despite expressing the period of elevated risk simply as five weeks post-vaccination, they did believe that a relevant latency period was implicated even though they did not explore it in detail." *Id.* at 21. The Special Master's recognition of these and other weaknesses does not mean he directly or implicitly required epidemiological proof of elevated risk on Day 1 or applied a standard inconsistent with *Althen*. *See Gamboa-Avila*, 166 F. 4th at 1322. Instead, his conclusion simply reflects his assessment of the record presented.

---

[8] In her Motion for Review, Petitioner seemingly disputes this limitation. She contends that "Dr. Polakowski … explicitly indicated that she excluded cases with preceding illness in her calculation of the statistically significant increased risk of GBS." ECF 109 at 16. Petitioner does not address that Dr. Polakowski expressly qualified her study by acknowledging that her "ability to account for preceding respiratory/gastrointestinal illness was limited." ECF 68-4 at 1; *see also id.* at 9 ("Limitations of this study included the inability to fully adjust for some potential confounders, including … preceding infections within the 6 weeks prior to GBS onset.").

B.  Finding of Correlation

Next, Petitioner criticizes the Special Master for finding that epidemiological studies demonstrate correlation, not causation, in contravention of the Vaccine Act's preponderant standard. ECF 109 at 18. Implicit in Petitioner's criticism is a contention that the Special Master erred by weighing her epidemiologic evidence against an improper standard. Respondent argues that the Special Master merely recognized a truism, and that this fact did not stop the Special Master from analyzing the epidemiology before him, as he was required to do. ECF 112 at 18 n.5.

The Court agrees with Respondent. Here, the Special Master agreed with Dr. Whitton's suggestion that "epidemiologic data is limited to demonstrating correlation, rather than causation." ECF 107 at 20. In assessing the Salmon and Polakowski studies, he later reiterated that "epidemiology is limited to demonstrating correlation." *Id.* at 22. Petitioner concedes that "this might be true in the scientific community that evaluates findings based on statistical significance," but argues that "in the Vaccine Court, epidemiological evidence that finds a statistically significant association between a vaccine and an illness is strongly indicative of causation." ECF 109 at 18.

Petitioner correctly notes that epidemiological evidence may be used to satisfy a petitioner's burden. *See, e.g.*, *Knudsen*, 35 F.3d at 549 ("[C]ausation can be found in vaccine cases based on epidemiological evidence…."); *Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1149 (Fed. Cir. 1992) ("[E]pidemiological studies are probative medical evidence relevant to causation."). That does not mean, however, that special masters must overlook the nature and limitations of such evidence. "[E]pidemiological studies are designed to reveal statistical trends…." *Moberly*, 592 F.3d at 1324. They show "a statistically-significant correlation between a given vaccine and a particular injury…." *Langland v. Sec'y of Health & Hum. Servs.*, 109 Fed. Cl. 421, 441 (2013). By acknowledging that epidemiological evidence "finds a statistically significant *association*," Petitioner seemingly recognizes this reality. ECF 109 at 18 (emphasis added). The Special Master's recognition of this truism is not error.

Further, the fact the Special Master recognized this truism did not stop him from analyzing whether "available epidemiology bolsters Dr. Steinman's view or otherwise persuasively establishes an increased risk of post-vaccination GBS inclusive of the first day post-vaccination." ECF 107 at 9. In other words, he looked to see if Petitioner's epidemiological studies warranted a causal inference. Had he actually believed that Petitioner's epidemiological studies were not relevant to causation, he would not have devoted six full pages to reviewing their findings and analyzing their weaknesses. *See id*. at 18-23. Under these circumstances, the Court cannot say that his recognition of what epidemiological data factually shows elevated Petitioner's burden of proof.

C.  Consideration of Circumstantial Evidence

Petitioner also challenges the Special Master's treatment of circumstantial evidence. The use of circumstantial evidence is "envisioned by the preponderance standard" and

consistent with the "system created by Congress, in which close calls regarding causation are resolved in favor of injured claimants." *Althen*, 418 F.3d. at 1280. Improperly rejecting circumstantial evidence thus impermissibly raises a claimant's burden of proof. *See Capizzano*, 440 F.3d at 1325-26. Seemingly recognizing this fact, the Special Master explicitly acknowledged that "[a] petitioner may rely upon circumstantial evidence." ECF 107 at 3.

Despite this acknowledgment, Petitioner alleges that the Special Master failed to consider circumstantial evidence under *Althen* prong 3. ECF 109 at 13, 17-18. Specifically, Petitioner maintains that the Special Master failed to consider as circumstantial evidence the 11 cases of GBS that occurred on Day 1 in the Schonberger study and the 26 cases of GBS that occurred within two days in the Park study. *Id.* at 13, 17. Unsatisfied with the Special Master's conclusions regarding the Schonberger and Park studies, she criticizes the Special Master for not independently considering the cases underlying those studies as standalone evidence. *See id.* at 13, 17-18.

This argument lacks merit. First, Petitioner effectively demands that this Court apply a requirement for a special master to analyze underlying data as freestanding evidence after evaluating the medical literature a petitioner presents. This Court is unaware of any such requirement. Second, a special master is presumed to have considered all proffered evidence, unless he indicates otherwise. *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 728 (2009); *Moriarty by Moriarty v. Sec'y of Health & Hum. Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016). He made no such indication here. Indeed, review of the Special Master's Decision reflects that he wholly credited the existence of the allegedly ignored cases as part of his analyses of the Schonberger and Park studies. With respect to the Schonberger study, which he acknowledged "indicate[s] that incidence of GBS were [sic] elevated relative to the first full week post-vaccination," the Special Master specifically noted that Figure 5 reflects "that approximately 11 cases of GBS occurred on days 0-1, with day 0 being the day of vaccination."[9] ECF 107 at 19; *see id.* at 20 (acknowledging "the fact that some cases of GBS occurred on the first day post-vaccination"). The Special Master then provided detailed reasons for declining to afford the Schonberger study (and by implication, its underlying cases) significant weight. For example, after reviewing the study's data and conclusions, he determined that "it is not clear that Schonberger … demonstrates any elevated risk of GBS on days 0-1 post-vaccination," especially as the authors did not draw this conclusion and "nothing in the study details the relative risk by day or specifically concludes that the data depicted in Figure 5 (11 cases of GBS on days 0-1) represented an increased risk in itself." *Id.* at 20. He further rejected Dr. Steinman's invitation to juxtapose two separate figures in Schonberger to reach such a conclusion when "these figures are not directly comparable"

---

[9] Notably, the Schonberger study itself does not explicitly report 11 cases on Day 1. Instead, the Special Master credited Dr. Steinman's interpretation of Figure 5 as showing 11 cases of GBS occurring on Days 0-1 because the bar rises to just below the 12-case mark. *See* ECF 107 at 19 n. 11.

15

and "[t]he examined populations are not the same." *Id.* And finally, he observed that "the fact that some cases of GBS occurred on the first day post-vaccination does not invariably lead to the conclusion that a causal relationship exists." *Id.* These statements indicate that, contrary to Petitioner's assertion, the Special Master did consider the 11 cases that occurred on Day 1 in Schonberger; he just declined to afford them the weight desired by Petitioner.[10]

Regarding the Park study, the Special Master likewise acknowledged that, of the 48 cases examined in the study, "more than half developed symptoms within 2 days." ECF 107 at 23. He then explained that the Park study—and again, by implication, the underlying cases—provide weak evidence of a medically acceptable timeframe due to the context of the study, which examined the demographic characteristics of GBS patients who submitted a claim for compensation under South Korea's equivalent of the Vaccine Program. *Id.* For instance, he observed that "the very high number of cases occurring within two days of vaccination is inconsistent with the overall distribution curve observed in [Petitioner's other studies], strongly suggesting that the parameters of the compensation scheme may have contributed to the distribution." *Id.* He also noted that the study was based on a "highly selective group" and that the study does not provide information on what criteria the compensating authority uses to adjudge eligibility. *Id.* This thorough analysis shows that the Special Master did not engage in the "complete dismissal of the circumstantial evidence demonstrating 26 cases of GBS occurring within 48 hours," as Petitioner alleges. ECF 109

---

[10] Petitioner appears to raise two subsidiary arguments related to the Special Master's perceived dismissal of the Day 1 Schonberger cases. First, she objects to an "implausible inference from the Langmuir study … about lognormal curve to dismiss those 11 cases." ECF 109 at 13. Next, she argues the Special Master "drew an implausible inference by relying on experimental studies that were not included in the record of the case." *Id.* at 13-14. The Court finds neither argument persuasive. Regarding the Langmuir study, the Court agrees with Respondent that it is unclear what error Petitioner assigns to the Special Master's interpretation of Langmuir. *See* ECF 112 at 17-18. The Court reads the Special Master's discussion of Langmuir as limited to a summary of its findings. *See* ECF 107 at 20-21. And regarding the Special Master's reference to experimental studies, the Court finds that Petitioner mischaracterizes the Special Master's actions. The Special Master did not consider studies outside the record, as alleged by Petitioner. Instead, he merely acknowledged that the Schonberger study referenced studies outside the record, and he considered the fact that the Schonberger authors detected a similar latency period to that observed in those studies. There is no indication the Special Master reviewed the unfiled studies himself. Nor did he draw any conclusion beyond that stated in Schonberger—that a latency period exists between vaccination and onset. *See id.* at 21. Under such circumstances, the Court cannot say that the Special Master improperly relied on a study not present in the record. In any case, even if the Special Master had improperly considered studies outside the record, such reliance did not amount to reversible error as "the special master's decision was based on a number of factors and [Petitioner] has not shown that reliance on the judicially noticed [information] was likely critical to the result." *Hines*, 940 F.2d at 1526; *see also Doe v. Sec'y of Health & Hum. Servs.*, 601 F.3d 1349, 1356 n.2 (Fed. Cir. 2010) (holding that the special master taking judicial notice of a table of brain weights "was harmless," as "[t]his table was not the only fact the special master relied on, or even the most important one, in declining to credit Dr. Shane's theory").

at 18. Instead, the Special Master simply found that the mere existence of the cases cited in the Park study was insufficient to meet Petitioner's burden.

Overall, the Special Master's analysis reflects that he carefully considered the medical literature Petitioner presented—which specifically addressed the allegedly ignored cases—and found they provide weak evidence of a medically-acceptable timeframe. Because the Special Master thoroughly reviewed the Schonberger and Park studies' data and conclusions, *see* ECF 107 at 19-21, 23, Petitioner's argument that the Special Master improperly rejected circumstantial evidence fails.

D. Reliance on the Black Study

And finally, Petitioner maintains that the Special Master impermissibly raised her burden of proof by relying on Dr. Whitton's purportedly flawed interpretation of the Black study to draw an implausible inference that the cases of GBS that occurred on Day 1 in the Polakowski and Salmon studies occurred as a result of chance. *See* ECF 109 at 16-17. The Black study is a piece of medical literature that "identified background rates of selected medical events."[11] ECF 43-27 at 1. Specifically, Petitioner takes issue with the Special Master's crediting of Dr. Whitton's testimony, based on the Black study, that five cases of GBS are expected each day as coincidental background cases. ECF 109 at 16-17. According to Petitioner, this calculation is flawed because it includes the number of GBS cases occurring due to a preceding infection, which the Polakowski study explicitly excluded. *Id.* at 16.

Conspicuously absent from Petitioner's criticism is any corresponding statement concerning the Salmon study. Instead, Petitioner isolates the Polakowski study and specifies that the Special Master "made an implausible inference that cases that occurred on day one (1) in Polakowski were coincidental or occurred by chance without any basis for that from the actual study." *Id.* at 17. Moreover, Petitioner overstates the significance of the Polakowski study authors' attempt to exclude cases with preceding respiratory or gastrointestinal illness from their analysis; on multiple occasions, the study authors acknowledged that one "limitation[] of th[eir] study included the inability to fully adjust for some potential confounders, including … preceding infections within the 6 weeks prior to GBS onset." ECF 68-4 at 9; *see also* ECF 68-4 at 10 (reiterating that their "ability to account for preceding illness was limited"); ECF 68-4 at 1 (same). Given these caveats, Petitioner's attack on the relevance of the Black study due to its failure to exclude GBS cases preceded by infection is weak at best.

Accordingly, the Court finds the Special Master drew a plausible inference when he inferred that "one or two cases of GBS occurring on any given day could be the result of chance, greatly tempering the potential significance of [the Salmon and Polakowski] findings." ECF 107 at 23. In his purview as factfinder, the Special Master is empowered to

---

[11] Steven Black et al., *Importance of Background Rates of Disease in Assessment of Vaccine Safety During Mass Immunisation with Pandemic H1N1 Influenza Vaccines*, 374 LANCET 2115 (2009).

weigh competing evidence and determine whether one study (in this case, Black) corroborates or undermines others (Salmon and Polakowski). *See Porter*, 663 F.3d at 1249 ("We do not reweigh the factual evidence, assess whether the special master correctly evaluated the evidence, or examine the probative value of the evidence … these are all matters within the purview of the fact finder."); *Moberly*, 592 F.3d at 1326 ("Finders of fact are entitled—indeed, expected—to make determinations as to the reliability of the evidence presented to them….").

Here, the Black study reported that, "if a cohort of 10 million individuals was vaccinated in the UK, 21.5 cases of [GBS] … would be expected to occur within 6 weeks of vaccination as coincident background cases." ECF 43-27 at 1. The authors likewise estimated that, if 100 million individuals were vaccinated during a pandemic H1N1 vaccine campaign in the United States, "200 or more new cases of [GBS] would occur as background coincident cases" in the 6-week follow-up period. *Id.* at 2. From these figures, Dr. Whitton estimated that approximately five cases of GBS per day would occur simply by chance across the 100 million people who receive flu vaccine each year in the United States.[12] ECF 92 at 124. It was not implausible for the Special Master to then infer that the two Day-1 cases observed in Salmon and the one Day-1 case observed in Polakowski "could be the result of chance" and thus did not represent "robust findings with respect to day 1." ECF 107 at 23. Accordingly, the Court discerns no error in the Special Master's reliance on the Black study or in his analysis.

## CONCLUSION

In this case, the Special Master applied the correct legal standard and found that Petitioner failed to prove causation by a preponderance of the evidence. That conclusion has not been shown to be legally or factually erroneous. Petitioner's Motion for Review (ECF 109) is therefore **DENIED** and the Special Master's Decision (ECF 107) is **SUSTAINED**. The Clerk of the Court is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

PHILIP S. HADJI
Judge

---

[12] Notably, Dr. Whitton's calculation aligned with the Black study's calculation of the number of expected background coincident cases on Day 1. *See* ECF 43-27 at 6, Table 6. For GBS, the Black study predicted that, per 10 million vaccinated people, .51 of them will develop GBS within one day. *Id.* Applying that same logic to a population of 100 million vaccinated people (a tenfold increase), it would be reasonable to see approximately five cases of GBS every day (10 * .51 = 5.1).